## WILLIAM E. CONNELLY, Appellant, v. DORA E. CONNELLY, Respondent.

### St. Louis Court of Appeals, February 3, 1903.

1.  **Divorce: CONDONATION: KNOWLEDGE:** There can be no condonation of the offenses of a guilty spouse without probable knowledge that the offense had been committed, and this probable knowledge exists where information of facts has been given by credible persons, speaking of what they have seen.

2.  ——: ——: ——: EVIDENCE: In the case at bar, the testimony is examined and set out in the opinion, and it is held that although plaintiff cohabited with defendant after suspecting her of unfaithfulness, his knowledge was not such as to condone the offense.

Appeal from Pike Circuit Court.—*Hon. David H. Eby,* Judge.

REVERSED AND REMANDED.

*Dempsey & McGinnis* and *J. D. Hostetter* for appellant.

(1) The findings of the court are substantially in favor of the plaintiff, and are to the effect that the conduct of the wife had been such, as to justify the granting of a decree of divorce to the husband, but for the further fact which we claim the court erroneously and without any evidence found to exist, viz., a condonation by the husband of all his wife's offenses, after full

knowledge of the same. The court also erroneously found that the husband discovered the letter from Malpe to his wife, in the latter's trunk on September 10. This is not correct. The letter was dated Bonham, Texas, September 7, and postmarked September 8, and was received by the wife at Bowling Green on September 10 and was found by the husband in her trunk about two weeks later, while she was again away from home and at Bowling Green. The final and formal separation took place November 8 or only about five weeks after the finding of the letter, and there is no evidence that plaintiff forgave her or condoned her offenses in any manner after the discovery of the letter. On the contrary the evidence of both plaintiff and defendant agree, that after finding the letter, the plaintiff became very unpleasant towards defendant and that he iterated and reiterated that he had no longer any confidence in her, that she had deceived him, and that she could leave any time, and wasn't fit to raise the children, etc. (2) No proposition is better settled, on reason, common sense, principle and precedent, than that there can be no condonation without knowledge of the acts and offenses to be condoned. Welch v. Welch, 50 Mo. App. 400; Odum v. Odum, 36 Ga. 286; Clark v. Clark, 9 Mass. 331; Bishop on Marriage and Divorce (5 Ed.), sec. 38.

*Pearson & Pearson* for respondent.

GOODE, J.—Both parties to this action pray for a divorce—plaintiff in his petition, and the defendant in her answer and cross-bill. They were married in January, 1893, and lived happily together for nine years, when Connelly became suspicious of the conduct of his wife and a Russian Jew peddler by the name of Malpe, who stayed a good deal at the home of the Connellys. Their home was on a farm eight miles from Bowling Green in Pike county, and prior to April, 1900, the peddler would occasionally stop there for dinner when

in that neighborhood.  After said date he often came on Friday or Saturday and stayed until Monday, and about the beginning of 1901 he commenced to call of-tener and stop longer, not remaining away, the plaintiff says, over two or three days at a time.  The demeanor of Malpe and Mrs. Connelly then first attracted the attention and aroused the suspicion of the plaintiff.  The peddler would frequently remain in the house when plaintiff was at work outside, and was detected by the latter observing him through the windows.  When Connelly returned to the house he sometimes found his wife and Malpe alone together in the bedroom, and the two appeared to spend much time to themselves, and to be unduly familiar.  One day late in July, 1901, plaintiff returned to the house unexpectedly on the pretext of getting a file, and found Malpe and his wife in the bed-room together, she standing at the open drawer of a bureau pretending to be looking for some linen for Malpe, who was near her in a posture which naturally created a suspicion as to their behavior.  This episode intensified the doubts of the plaintiff and caused him to resolve to drive the Jew away.  A few days later Connelly, who is part Irish, took exception to a remark of the Jew's about the character of the Irish race, and, partly out of anger at the remark, and partly because of his previous irritation on account of the behavior of the Jew and his wife, he ordered Malpe to leave the place, and on the latter's refusal to leave a fight followed during which Connelly thought his wife sided with Malpe.  Her behavior was brought up in the course of the altercation, and the next day she declared an intention to return to her relatives in Tennessee, and asked her husband to give her three hundred dollars for that purpose.  He drove her to Bowling Green at her request, and gave her some money.  While in Bowling Green friends intervened, a reconciliation was effected, and the two went home together where they

stayed a week or so, and then took a trip to Tennessee, Connelly making the trip, his wife testified, to afford her the pleasure of visiting her relatives and friends. They remained in Tennessee two weeks and returned to their home.

Towards the latter part of September, the defendant's manner caused her husband to suspect she was engaged in a correspondence with Malpe, with the result that he searched her trunk and found a letter from Malpe hidden in a bolt of goods.

We quote that letter with its broken English and bad spelling:

"Bonham, Texas, September 7, 1901.

"Mrs. Dora My Dear Friend:—I received to-day your letter, this being the first letter from you since I left. I went from B. G. to St. Louis the 3rd of August and staid in St. Louis until the first of September. I anxiously awaited a letter from you but none came. I am now in Texas, I opened a dry goods store in Bonham, Texas, this town is about six thousand inhabitants. I will be ready for business on the 15th of this month. You asked me concerning my family, haven't heard from them. I dont know wen they will come. The reason you haven't heard from me sooner I thought you not at home and I didn't know your address, am not mad at you, my D. I am not mad at you, I will be always your friend as I have been heretofore and I will do all I can in my power to help you. Remember wat I say. I cant forged you all my lief. I swear to you and I will keep my wort only I didn't want you to work and I want to hear from you every week also send me your picture you promised me. I send one thousand kisses for both of your babies I can't forged. Will close write to me at once I am ordered to you for the silk waist, I will sent you a check in B. G. bank. My address is P. Malpe, Bonham, Texas.

"Send me your letter direct to texas from St. Louis. I am 1500 miles from St. Louis, it cost me a ticket 21.60,

I have notes on the people, tell me what to do about collecting my money. Please write soon. Will close as I am busy. It is twelve toknit. I am going to bed. Hoping to hear from you soon I remain

"Your friend forever,

"I send you one thousand k."

Quarrels followed the discovery of the quoted letter, and though the defendant did not leave home until a month or more afterwards, the relations of the parties were discordant from that time to November, when the final separation occurred. After that separation Connelly was shown a letter written by his wife to Malpe in August, which Malpe had lost on the premises of James McPike, a near neighbor of Connelly's, where it was found by McPike's daughter. That letter was as follows:

"Bowling Green, Mo., August 1, 1901.

"Dear Friend:—Will you please meet me in B. G. Saturday morning or leave me a letter with $10 or $15 in it, with the postmistress and tell her I will be in town Saturday, not to let it go in the mail. He said at first I could have three hundred dollars and the children, but now he wont let me have a cent of money. I am going to see a lawyer Saturday and see what I can do and I have to hire a team and wagon to come after my trunk and things. I don't want any of the neighbors to haul them. I want to show him some one else has some money besides him. Please be careful what you say about me. I want to go Saturday morning and leave the children in town and come after my things and stay at the hotel until I start away from here. Don't fail to leave the money at the post office. I want to get away from Pike county as soon as possible. If you are going to Ashley come by B. G. I want to leave Sunday, if possible. I am nearly crazy. (On margin) Let us go quick."

Besides the facts mentioned, others might be stated

to show the defendant cherished an improper sentiment. for Malpe and had meditated forsaking her husband to go to him. On one occasion she told a friend that she had been dreaming "of her old boy," and being asked who that was she said, "Malpe, of course." She said to another friend in the course of a conversation about Malpe, "If it wasn't for my children there is no telling what would happen."

The defendant testified that Malpe was brought to her house to board against her wishes, that no improper relations had ever existed between them, that she wrote to him to get money because her husband would not give her any, that when she said in the letter to Malpe, "Let us go quick," she referred to herself and children. She admitted writing at least one other letter of the same kind, and that she understood the sentence in Malpe's letter to her, "I send one thousand k" to mean one thousand kisses, but said that Malpe had no right to send such a message. She further testified that her husband cursed and abused her and applied vile epithets to her, which, indeed, he acknowledged doing after he discovered her correspondence with Malpe, and said she used as harsh language to him.

Plaintiff does not charge the defendant with adultery in his petition, but states the substance of the foregoing facts about her relations with Malpe, and that she intended to run away with him, alleging that her conduct created a public scandal and constituted indignities which rendered the plaintiff's condition intolerable. The custody of the two children, a son aged eight, and a daughter aged twelve years, is asked by the plaintiff.

The answer and cross-bill accuses the plaintiff of grossly abusing the defendant, cursing her, calling her vile names in the presence of her children and others, accusing her of improper relations with Malpe, and further charges that the general violence and indecency of plaintiff's behavior towards defendant rendered her condition intolerable.

The learned circuit judge dismissed both the petition and the crossbill, and refused to grant either party a divorce, but found that the defendant had committed all the indiscretions and indignities above stated, and that an improper intimacy existed between her and Malpe, but that the plaintiff had debarred himself from relief by condoning his wife's transgressions, inasmuch as he had lived and cohabited with her after he became aware of her conduct. The court below laid stress on the fact that the plaintiff continued to cohabit with his wife after discovering her alone in the room with Malpe in the suspicious circumstances narrated; also on the reconciliation which took place after the first separation.

The most damaging facts proven against the defendant were unknown to Connelly when the reconciliation occurred. He was not then aware of her clandestine correspondence with Malpe, nor of the contents of the letters they had exchanged; and while he did not drive her away from home, nor leave himself, as soon as he found the letter in her trunk, their relations were embittered from that time until the final separation, and there is no proof of cohabitation subsequent to that date. The worst circumstance of all, to-wit, the letter written by the defendant to Malpe, became known to the plaintiff after the last separation. He was then told, too, for the first time, various incidents which his neighbors knew tending to prove his wife cherished a passion for Malpe and had meditated deserting her family to go to Malpe. Those indignities were never condoned and could not have been; for the plaintiff was ignorant of them while he and his wife lived together. There can be no condonation of the offenses of a guilty spouse without probable knowledge that the offense had been committed. Welch v. Welch, 50 Mo. App. (K. C.) 395; Anonymous, 6 Mass. 147. Absolute knowledge of guilt is not essential to condonation, but the law, as stated by an eminent commentator, seems to require moral certainty:

"Married persons, the same as single, are supposed to comprehend proofs.   Therefore the doctrine of condonation is usually, but not with entire scientific accuracy, stated to be that cohabitation, after probable knowledge of the offense, is a presumptive remission of it.   This *probable knowledge* has been said to exist where information of facts has been given by credible persons, speaking of what they have seen; particularly if the party afterwards produces the same witnesses on the trial of the cause, and by their testimony establishes the same facts.   Circumstances of mere suspicion are not adequate.   Suspicion is not knowledge.   It is not belief."   Bishop on Marriage, Divorce and Separation, vol. 2, sec. 294.

Connelly as stated, does not accuse his wife of adultery, nor does the evidence show he was ever convinced she was guilty of that act.   Prior to the first separation he was annoyed and irritated by her behavior, and suspected her of unfaithfulness; but she gave plausible explanations considering the familiar status a lodger in a household of simple people may acquire.   The main indignities he found proof of after they had last separated, when people told him freely what they had seen and heard.   We can not agree that plaintiff is shown to have condoned those indignities, but do agree that uncondoned, they constitute sufficient grounds for a decree of divorce.

We would much prefer that this unhappy pair should bury their resentments, become reconciled once more and endeavor to live together as husband and wife should, and rear their young children.   The testimony does not satisfy us beyond a doubt that the defendant ever yielded to a criminal intimacy or put herself beyond the pale of forgiveness.   It does show clearly, however, that she became deeply interested in Malpe, and under his influence forgot her allegiance to her husband, and did many indiscreet and compromising acts amounting to intolerable indignities.

The judgment is reversed and the cause remanded with directions to dismiss the defendant's cross-bill and grant the plaintiff a divorce and the custody of his children, with such conditions in respect to the right of the defendant to visit and enjoy the society of the children as the circuit court may deem right and proper. *Bland, P. J.,* and *Reyburn, J.,* concur.